## Kathiotes et al. v. Mosler et al.

*Henry Arronson* and *Horace M. Barba,* for plaintiffs.

*Herbert Mayers, Nathan Lavine* and *W. Horace Hepburn, Jr.,* for defendants.

ALESSANDRONI, J., August 25, 1953.—Plaintiffs, the majority holders of the equitable interests of the common stock of defendant, Central Victory Coat and Apron Supply Co., Inc. (hereinafter referred to as Central), instituted an action in equity seeking the relief hereinafter summarized: The appointment of a

receiver for Central; an accounting for the management of Central; an order requiring money and property allegedly acquired personally by some of the defendants from Central to be returned; an injunction restraining some of the defendants from managing Central, and from interfering with Central's customers or routes; an accounting for profits realized from customers induced to break contracts with Central; a declaration that the class A stock issued by Central to Abel & Silber is null and void, and that said shares are to be surrendered for cancellation.

Responsive answers were filed by the several defendants. The matter came on for hearing. At the conclusion of plaintiff's case, counsel for defendants Herman B. Mosler, Albert G. Mosler and Crown Coat, Apron and Towel Service Co., Inc. (hereinafter referred to as Crown) moved to dismiss the bill. Under the present practice, Pa. R. C. P. 1512, the proper motion is for a nonsuit, and it is on that basis that we consider the matter.

The controversy arose out of the following facts: On July 27, 1950, an agreement was executed by and between Liberty Laundry Co., Inc. (hereinafter referred to as Liberty) and Central, on the one hand, and defendants, Abel & Silber, on the other. This agreement provided, inter alia, as follows: Liberty was to issue 1,686 shares class A stock, par value $1, and Central was to issue 435 shares of class A stock, par value $1, to Abel & Silber. The agreement provided for the amendment of the articles of both Liberty and Central to create the new classes of stock. The class A shares were to have the following attributes: (1) Vote as a class; (2) power to elect one half of the directors; (3) they were to be nonredeemable; (4) were to receive as a class 50 percent of the profits; were to be on a par with preferred shares upon dissolution, liquidation, etc. Liberty was to deliver the

1,686 shares of class A stock, fully paid and non-assessable upon the following terms: $100,000 in cash, promissory note for $25,000, payable in three annual installments of $8,333.33 each year, the notes were secured by a pledge of the shares. Even though pledged the class A shares were to receive dividends.

Central was to deliver 435 shares of class A stock, fully paid and nonassessable for 10 promissory notes of $12,500 each, maturing consecutively each year. The notes were likewise to be secured by a pledge of the shares. The power to name various officers of Liberty, Central and White-Way Service Corp. was divided between the two groups, i.e., the class A shares and the common shares. The agreement also specified the annual compensation to be paid to various individuals and the officers of the corporations. Each group was to elect four directors for each corporation; the parties mutually agreed on the ninth director for both Liberty and Central.

Liberty and Central covenanted with Abel & Silber that the class A shares were validly authorized, legally and properly issued, sold and delivered, and that the class A stock would be binding upon the corporation and all beneficially interested shareholders therein. They further agreed that Abel & Silber were to be indemnified and saved harmless from all liability, loss or damage that might occur from a trust agreement theretofore executed on December 16, 1949, by and between the holders of the common shares of Liberty and Central, and that the class A shares were issued, sold and delivered fully paid and nonassessable, and were to be freely assignable by Abel & Silber. The agreement was stated to be binding upon all concerned. The document was executed on behalf of Liberty, by Kathiotes (a plaintiff), as president, and Epamonindas T. Halkias, treasurer, for Central, by James Kathiotes, vice president, and Epamonindas T. Halkias, treas-

urer; and by Abel & Silber. One half of the class A shares were subsequently assigned to the Moslers.

The agreement was ratified, confirmed and approved by Horace Barba, James B. Mitchell and Morton P. Rome, voting trustees for all the voting capital stock of Liberty and Central, the only class of stock that existed prior to the amendment of the articles. The agreement was likewise approved and confirmed insofar as applicable to it, for the Philadelphia Toilet and Laundry Co., by James B. Mitchell.

The articles of incorporation of both Liberty and Central were amended to provide for the various classes of stock to be issued pursuant to the agreement of July 27, 1950. Significantly, present at the above meeting of Central to authorize the necessary amendments, were not only the voting trustees, but also present in person or by proxy were the holders of the equitable title to the common shares.

The gravamen of plaintiffs' bill is that Abel, Silber and the Moslers are not now nor were they ever shareholders of Central; but despite this allegation, they are asserting and usurping the status of shareholders and directors. Incidental to this charge are the charges of mismanagement and personal aggrandizement at the expense of Central's assets. They charge that the above men refuse to permit the "rightful" shareholders and directors to function.

Concerning the charge of mismanagement, we feel that the state of the record requires little consideration. The evidence adduced to support this averment is woefully insufficient. Hence, if the bill's prayer were based on this allegation, it would be dismissed with no further comment.

However, a very basic question is presented for decision; the parties have apparently proceeded on the assumption that plaintiffs have capacity to ask the court to declare the class A stock invalid and void.

None of the parties have raised the issue; the court, therefore, undertakes to consider this question on its own motion, because if there is no capacity, it would be tantamount to the parties attempting to confer jurisdiction by agreement.

If plaintiffs lack capacity to maintain this suit for a declaration that the stock is void, as we think they undoubtedly do, then the entire matter merits no further consideration. Capacity is the first and most basic element necessary to the institution of an action at law or in equity.

We proceed now to analyze the cause of action. The bill seeks a receivership, it asks for an accounting with several particular and specific references, it asks for a declaration that the stock issued to Abel, Silber and their assignees is void; and it seeks return of control of defendant Central. It might very well be said that the major prayer of the bill, apart from its many ramifications, is to deny defendants Abel, Silber and the Moslers any right to act as shareholders or as directors and officers of Central.

To ascertain the rights granted and the status conferred we must needs examine the agreement of July 27, 1950. Parenthetically, it needs to be emphasized that the agreement states that the class A shares are to be binding upon the corporations and all beneficially interested shareholders; the agreement was subsequently ratified by all of the voting trustees of the capital stock, including both plaintiffs' shares. As a practical matter such an agreement could not have been executed without the knowledge and consent of plaintiffs. They were the holders of the majority of the equitable interest prior to the agreement.

The agreement conferred the rights that Abel, Silber and the Moslers are asserting. Plaintiffs seek to repudiate the agreement. Under the terms of the agree-

ment, we here decide, that since they, plaintiffs, though not signatory thereto, were party to the transaction, they have no power to place the validity of the agreement at issue. This lack of capacity was established beyond the shadow of a doubt by plaintiffs' own bill. Paragraph 16 of the bill states that at the meeting called in March 1950 to amend the articles of Central to provide for new classes of shares, there were present either in person or by proxy all of the holders of the legal title to the shares (the voting trustees), as well as the holders of the equitable title thereof. The record is barren of the registration of a dissent by either plaintiff, in person, or by proxy.

The amendments to the articles of Central were necessary in order to consummate the subsequent agreement of July 27, 1950, with Abel and Silber. Plaintiffs knew of the reason for the amendments; they also held the majority equitable interest in Liberty. Central, as will hereinafter be discussed, was the bait, the lure, the attractive wrapping for a package. Plaintiffs cannot now repudiate the agreement; the corporation signed the agreement; Kathiotes, a plaintiff, signed in his capacity as an officer. The trustees also ratified, confirmed and approved the agreement. By its very terms plaintiffs are estopped from denying its validity. They will not be permitted to don the protective mantle of the innocent and unknowing shareholder.

Nevertheless, despite the express estoppel presented in terms by the agreement, plaintiffs seek to repudiate it. They allege that the contract violates the law applicable, governing the issuance of shares. Article XVI, sec. 7, of the Constitution of this Commonwealth, provides:

"No corporation shall issue stocks or bonds, except for money, labor done, or money and property actually

received; and all fictitious increase of stock or indebtedness shall be void."

The Business Corporation Law of May 5, 1933, P. L. 364, sec. 603, 15 PS §2852-603, provides:

"Shares of a business corporation shall not be issued except for money, labor done, or money or property actually received."

It is significant that the statute does not declare such stock to be void. The significance lies in the judicial construction heretofore made of article XVI, sec. 7, of the Constitution. The law is well settled, the provision has been held to be not self-executing: Yetter v. Delaware Valley Railroad Company, 206 Pa. 485; Bradford County Telephone Company et al. v. Young, Admr., et al., 329 Pa. 433.

Therefore, assuming, without deciding, that the stock was issued in violation of the Constitution, who then has the capacity to have it judicially declared void? We need not consider all possible cases; we need only decide whether or not these plaintiffs have such standing. The agreement expressly states that Liberty and Central covenant, warrant and represent that the agreement was made on the faith of the following: (1) The class A shares were validly authorized, legally and properly issued, and that the class A shares were binding upon the corporation and all beneficially interested shareholders therein; (2) Abel and Silber were to be indemnified and saved harmless from all liability, etc., arising out of the voting trust agreement; (3) the class A shares were fully paid and non-assessable, and were to be freely assignable.

Could the corporation institute an action to have the stock declared void, despite the express covenants contained in the agreement? We think it might, under certain conditions, namely, the relief of innocent shareholders who were wronged by the issuance of the shares.

In Spangler Brewing Co. v. McHenry, 242 Pa. 522, the court reversed a decree under the following substantive facts: McHenry was a promoter of the corporation. Prior to its organization he took title to certain land for $850; after the corporation was organized, the shareholders and directors authorized, by prearrangement, the issuance of $57,900 worth of capital stock to McHenry for the purchase price of the above land. The court clearly held that absent an innocent shareholder, the corporation could not take advantage of a right to have the shares now declared to be unpaid. The president of the corporation, who signed the bill, received a share of the stock issued to McHenry. The bill was dismissed.

It does not seem to be an unreasonable extension of the above holding, apart from the procedural aspects of that case, to say that a noninnocent shareholder likewise lacks capacity to have shares declared to be either (1) void, or (2) not fully paid, when they have been issued with full knowledge of all of the facts on the part of the shareholders.

It is inconceivable that plaintiffs could be permitted to assert the rights of innocent shareholders. They were the holders of the majority of the voting stock of Liberty and Central prior to the voting trust agreement of December 16, 1949. Plaintiff Kathiotes was president of Liberty and vice president of Central and executed the agreements on behalf of both corporations. Hence, it can be declared that plaintiffs lack capacity to have the stock declared invalid, assuming without deciding that it was issued in violation of the Constitution and statutes.

In order to better appreciate exactly what transpired before the agreement of July 27, 1950, was executed, we must review the surrounding circumstances. Liberty, the laundry for Central, owned by the same stockholders as Central, was navigating in

very heavy financial seas. It became apparent early in 1950 that without a financial transfusion, Liberty would go under; efforts to secure money for Liberty proved unavailing. It was determined in March of 1950, according to the testimony of one of the voting trustees, that if fresh capital was to be obtained for Liberty, the proposition needed a "sweetener" in order to attract an investor. The inducement was to be an opportunity to buy into Central, a sound, going concern. Thus, the two corporations were "packaged" in order to obtain money in an effort to save Liberty from bankruptcy.

With the addition of the "sweetener", $100,000 in cash was obtained for Liberty. Subsequent events proved that the new money was insufficient to prevent Liberty from going into bankruptcy. But the plaintiffs received the benefit of the use of the new capital for Liberty, although the effort was unsuccessful; the benefit is obvious since plaintiffs, the holders of the majority equitable interest in Liberty's voting stock, stood to gain the most by salvaging Liberty.

Plaintiffs would like to separate the transaction between Liberty and Central in order to establish that there was no consideration for the shares of Central. They argue that it was not a package deal; they point to the agreement wherein it was provided that $100,000 was to be paid to Liberty, and notes were to be given to Central. However, if this were a "package deal", and we think the evidence is conclusive that it was, there was some consideration for all of the shares, a $100,000 worth. Even while they point to the provision of the agreement that the money was payable only to Liberty to support their position that the two corporations were considered separately, they attempt to repudiate that part of the agreement that confers rights in Central, and which declares the shares to have been fully paid and nonassessable and legally

issued. Significantly, the covenants were made jointly and severally by both Liberty and Central. Plaintiffs have nowhere alleged that fraud was an element.

Plaintiffs will not be permitted to use the part of the agreement which is favorable to their position and disregard that which is unfavorable. They must accept all of it or reject all. Under the peculiar circumstances of the closeness of the holdings of the two corporations, the aspiring of the majority shareholders to the position of innocent shareholders pleading with the conscience of a chancellor to redress a grievous wrong, comes with ill-grace. Unfortunately, they cannot legally or morally sustain their right to that desirable status.

Plaintiffs also argue that notes cannot be considered payment. If the question of payment of the notes were before the court, we would concede their position. See Bell, Secretary of Banking, v. Aubel, 151 Pa. Superior Ct. 569. However, the question is not now before the court, nor will the bill allow it to be considered: Spangler Brewing Co. v. McHenry, supra. If Abel, Silber and the Moslers were sued on the notes, they could not defend on the ground that the consideration for the notes was illegal.

Our finding of lack of capacity makes it unnecessary to consider the effect of the claims filed in Liberty's bankruptcy action.

The pleadings and testimony lead to but one conclusion, the bill must be dismissed. Plaintiffs lack capacity to have the shares declared void; they have failed to establish the charges of mismanagement and personal aggrandizement.

### Order

And now, August 25, 1953, defendants' motion for a nonsuit is granted. Costs are to be borne by plaintiffs.